The BLACKFEET TRIBE OF INDIANS, Plaintiff,

v.

STATE OF MONTANA et al., Defendants.

No. CV–78–61–GF.

United States District Court, D. Montana, Great Falls Division.

Jan. 6, 1981.

Dale L. McGarvey and John M. Schiltz, McGarvey, Lence & Heberling, Kalispell, Mont., Phil Roy, Browning, Mont., for plaintiff.

R. Bruce McGinnis, Chief Legal Counsel, Montana Dept. of Revenue, Helena, Mont., Allen B. Chronister, Asst. Atty. Gen. of Mont., Helena, Mont., Helena S. Maclay, Sp. Asst. Atty. Gen. of Mont., Missoula, Mont., Bruce McEvoy, Sp. Asst. Atty. Gen., Jurisdiction Project, Missoula, Mont., Selden Frisbee, Deputy County Atty., Cut Bank, Mont., Douglas Anderson, County Atty., Conrad, Mont., for defendant.

## MEMORANDUM

HATFIELD, District Judge.

In this action the Blackfeet Tribe of Indians challenge five Montana taxation statutes. The Tribe seeks declaratory relief, with injunctive enforcement, from the state's statutes. These statutes authorize the state or county to levy and collect taxes from oil and gas production. The parties have filed cross motions for summary judgment, filed appropriate memoranda and the matter is ripe for disposition. Jurisdiction is invoked pursuant to 28 U.S.C. § 1362, 28 U.S.C. §§ 2201 and 2202. For the reasons stated below the taxes challenged herein are valid. There being no genuine issue as to any material fact, summary judgment shall be entered in favor of defendants.

## FACTS

Plaintiff, the Blackfeet Indian Tribe (hereinafter the "Tribe"), is a tribe of American Indians duly organized pursuant to the Indian Reorganization Act, 25 U.S.C. § 461, *et seq.* The Tribe is the beneficial owner of oil and gas which lies beneath its reservation in Montana. Title to the oil and gas is held by the United States in trust for the Tribe. Certain oil and gas leases have been executed between the Tribe and various non-Indians allowing for the production of oil and gas on the Blackfeet Indian Reservation. Under the facts alleged here the lessor is the Tribe and the lessee is a non-Indian oil and gas producing entity.

The defendants in this action, the State of Montana and the counties of Glacier and Pondera, impose, levy and collect various taxes on the production of oil and gas within the State of Montana in a non-discriminatory manner pursuant to various Montana statutes.[1]

The Blackfeet Tribe has entered into many oil and gas production leases with non-Indian lessees. Since neither the Tribe nor any single member of the Tribe produces any of the oil and gas, they receive a royalty fee from the non-Indian lessee. It is agreed that any and all taxes collected by the state defendants from the production of oil and gas within the Blackfeet Indian Reservation have been paid to the state by non-Indian lessees engaged in the business of producing oil and gas. There have been no liens or encumbrances placed on any tribal property as a result of the taxation statutes. The Montana statutes also provide that in the absence of lease provisions to the contrary, the producer may reduce the royalty fee by a prorata share of the cost of the tax. *See* § 15–38–104, M.C.A. (Resource, Indemnity, Trust, Tax); § 15–

36–101(4), M.C.A. (Oil and Gas Severance Tax); § 15–23–607(2), M.C.A. (Oil and Gas Net Proceeds Tax).

Without determining whether the legal incidence of these taxes fall upon the non-Indian lessee or the Tribe as lessor of the property, it is possible for the legal incidence of the tax sought to be imposed to fall on the Indians. However, that legal determination need not be made for the purposes of this summary judgment ruling. *See* Footnote 2, *infra.*

With the foregoing as a factual background, a review of the applicable federal law is in order.

## FEDERAL STATUTES

By an act of Congress dated February 28, 1891, hereinafter the "1891 Act", found in 25 U.S.C. § 397, the federal government authorized mineral leases of Indian land under such terms and conditions as the Tribe might recommend, subject to the approval of the Secretary of Interior. By an act ʹdated May 29, 1924 (now codified 25 U.S.C. § 398), hereinafter the "1924 Act", Congress authorized mineral leases for oil and gas and authorized states to tax the production of the same so long as no lien or charge of any kind or character could encumber the land of the Indian owner. The statute provides in full:

> Unallotted land on Indian reservations other than lands of the Five Civilized Tribes and the Osage Reservation subject to lease for mining purposes for a period of ten years under § 3 of the Act of February 28, 1891 (25 U.S.C. § 397), may be leased at public auction by the Secretary of the Interior, with the consent of the Council speaking for such Indians for oil and gas mining purposes for a period of not to exceed ten years, and as much

1. The following are the Montana statutes challenged:

> 1. The Oil and Gas Conservation Tax, § 82–11–131, M.C.A. (formerly § 60–145, R.C.M. 1947);
> 2. The Resource Indemnity Trust Tax, § 15–38–104, M.C.A. (formerly § 84–7006, R.C.M. 1947);

3. The Producers License Tax, § 84–2202, R.C.M.1947, repealed July 1, 1975 and replaced by the Oil and Gas Severance Tax on July 1, 1975;
4. The Oil and Gas Severance Tax, § 15–36–101, M.C.A.
5. The Oil and Gas Net Proceeds Tax, § 15–23–601, *et seq.,* M.C.A. (formerly § 84–6201, *et seq.,* R.C.M.1947).

longer as oil or gas shall be found in paying quantities, and the terms of any existing oil or gas mining lease may in like manner be amended by extending the term thereof for as long as oil or gas shall be found in paying quantities: *provided, that the production of oil and gas and other minerals on such lands may be taxed by the state in which said lands are located in all respects the same as production on unrestricted lands*, and the Secretary of Interior is authorized and directed to cause to be paid the tax so assessed against the royalty interest on said lands: provided, however, that such tax shall not become a lien or charge of any kind or character against the land or the property of the Indian owner. (emphasis supplied)

Because of what in effect amounted to a patch-work state of the law governing mineral leases on tribal land, *see*, Handbook of Federal Indian Law, Felix S. Cohen, p. 328 (1942), Congress enacted comprehensive legislation governing the leasing of tribal lands for mining purposes. An act dated May 11, 1938, hereinafter the "1938 Act", now found in 25 U.S.C. §§ 396a thru 396f, was passed which imposed various procedural standards for leasing unallotted Indian lands for mining purposes. That mining act provided in pertinent part:

§ 396a ... Unallotted lands within any Indian reservation ... may, with the approval of the Secretary of Interior, be leased for mining purposes, by authority of the Tribal Council ..., for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities.

§ 396b provided in pertinent part

... Leases for oil—and/or gas mining purposes covering such unallotted lands shall be offered for sale to the highest responsible qualified bidder, at public auction or on sealed bids, after notice and advertisement, upon such terms and subject to such conditions as the Secretary of Interior may prescribe....

§ 396c provided

... Lessees of restricted Indian lands, tribal or allotted, for mining purposes, including oil and gas, shall furnish corporate surety bonds, in amounts satisfactory to the Secretary of Interior, guaranteeing compliance with the terms of their leases: ...

§ 396d provided

All operations under any oil, gas, or other mineral lease issued pursuant to the terms of any act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of Interior....

§ 396e provided

The Secretary of Interior may, in his discretion, authorize superintendents or other officials in the Indian service to approve leases for oil, gas, or other mining purposes covering any restricted Indian land, tribal or allotted.

§ 396f dealt with exceptions concerning certain Indian reservations not of relevance here. The 1938 Act also included a general repealing clause that all acts or parts of the acts inconsistent herewith are hereby repealed. *See*, § 7 of the Act of May 11, 1938.

## ANALYSIS

Plaintiff's argument essentially asserts that the Blackfeet Tribe has an inherent right to be free from taxation by the State of Montana and two of its counties. The United States Supreme Court has on occasion ruled that the state general taxing powers cannot be thrust upon the Indians, the Tribes or their property absent congressional authorization. *See, Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *Confederated Salish and Kootenai Tribes v. Moe of the Flathead Reservation*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); *McClanahan v. Arizona State Tax Comm.*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *British-American Oil Producing Company v. Board of Equalization of Montana*, 299 U.S. 159, 57 S.Ct. 132, 81 L.Ed. 95 (1936). Historically, Indians have been found to be exempt from taxes on Indian ownership and activity confined to the reservation. However, those same U. S. Supreme Court opinions have

consistently recognized that Indian sovereignty in this regard is dependent upon congressional preservation. See *also, U. S. v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978).

Congress may at anytime authorize the state to tax Indian property or activities so long as any state tax authorized by Congress is a non-discriminatory exercise of state sovereign authority. Thus absent discriminatory state action which is prohibited by the Indian commerce clause, the question is only one of congressional intent. Either Congress intended to allow the state to exert its taxing authority or it did not. With the traditional assumption of Indian sovereignty as a backdrop, a review of the relevant statutes is necessary to determine whether this historical immunity has been altered by Congress.

A plain reading of the 1924 Act clearly authorized state taxation of production of oil and gas and other minerals. The Act states in part:

> ... provided, that the production of oil and gas and other minerals on such lands may be taxed by the state in which said lands are located in all respects the same as production on unrestricted lands, and the Secretary of Interior is authorized and directed to be paid the tax so assessed against the royalty interests on said lands: ...

Therefore, absent an express or an implied repeal Congress has clearly expressed an intent to allow the state to impose their inherent taxing power.

A review of subsequent congressional legislation reveals no federal statute expressly showing a departure from the view that the states have the power to tax oil and gas extraction. The Tribe agrees with this but argues that the 1924 Act has been impliedly repealed by the 1938 Act dealing with the leasing of unallotted Indian lands for mining purposes.

A cardinal rule of statutory construction is that repeals by implication are not favored. *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *Jones v. Alfred Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Furthermore, the principle that repeals by implication are not favored carries special weight when the court is urged to find that a specific statute has been repealed by a more general one. *U. S. v. United Continental Tuna Corp.,* 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976); *see, also, Bradley v. Kissinger,* 418 F.Supp. 64 (D.C.1976).

Repeal by implication is possible when there is a positive repugnancy between two statutes or where the legislature's intent to repeal is clear and manifest. *Wilderness Society v. Morton,* 479 F.2d 842 (C.A.D.C.1973), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973); Accord, *Southeastern Financial Corp. v. Smith,* 397 F.Supp. 649, *rev'd on other grounds,* 542 F.2d 278 (5th Cir. 1976); *U. S. v. Pacelli,* 491 F.2d 1108 (C.A.N.Y.1974), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974). Thus if provisions in two separate acts are in irreconcilable conflict, the latter act to the extent of the conflict constitutes an implied repeal of an earlier act. In addition, if a latter act covers the whole subject of an earlier act and is clearly intended as a substitute, the latter act acts as a repeal of the earlier act, but, in either of these situations the intention of the legislature to repeal must be clear; otherwise the rule of construction is that a latter act is to be construed as a continuation of and not a substitute for the first act. *Johnson v. City of Cincinnati,* 450 F.2d 796 (6th Cir. 1971).

The Tribe's major argument for repeal is that the 1938 legislation was intended as a "comprehensive law covering mineral leases on unallotted land." *See,* F. S. Cohen, Handbook of Federal Indian Law, p. 328 (Government Printing Office 1940 ed.).

The 1938 Act, as a comprehensive revision of the existing law, addressed nearly every subject concerning the leasing of Indian lands for mining purposes including oil and gas development. *See* 25 U.S.C. §§ 396a thru 396f. The statute, however did not address the issue of state taxation of mineral production, nor can any legislative history be found concerning the same. The

Tribe argues that because permission to tax was part of the existing mineral leasing law and the new statute was designed to be comprehensive in nature, Congress impliedly intended to repeal the state's permission to tax. This court disagrees with this line of reasoning.

In the first place, if, as the Tribe contends, Congress chose to completely revise the existing mineral leasing law on tribal lands it could have easily changed the existing tax authorization section. Moreover, the Tribe is unable to point to anything in the legislative history of the 1938 Act which can support this repeal by implication. Nor is there anything irreconcilable between the 1924 Act and the alleged repealing Act of 1938. A much stronger congressional intent than the enactment of a comprehensive leasing act must be made to repeal an earlier act dealing with the same subject which authorizes state taxation of gas and oil production on tribal lands.

The line of authority for statutory construction is further buttressed by principles of law dealing with uniform administrative practice. Since the passage of the 1938 Act until a November, 1977 legal memorandum from the Assistant Secretary for Indian Affairs, the Department of the Interior has consistently viewed with approval the states' taxing power over production of oil and gas on tribal lands leased by the Tribes. Thus for nearly 40 years the agency charged with interpretation of a congressional statute and the individuals charged with the responsibility of its operation have not disputed the states' taxing authority.

The Tribe has placed great reliance on the memorandum dated November 7, 1977, in which a Solicitor for the Department of Interior concluded that the 1924 state tax authorization act was impliedly repealed by the 1938 comprehensive leasing act. However, within this memorandum itself, the Solicitor states that there had been at least four opinions written by previous solicitors which upheld and acknowledged the power of the state to tax production of oil and gas from tribal leases. The first such opinion by a Solicitor was issued in 1943 and the latest opinion reaffirming the conclusion was in 1966. In spite of these departmental interpretations, in 1977 a Solicitor issues an opinion which concludes that the previous Solicitor opinions were legally erroneous. This lone opinion then became the foundation by which this litigation attempts to reverse approximately 40 years of administrative practice.

The persuasiveness of an administrative interpretation of a statute depends upon the thoroughness evident in its consideration, the validity of its reasoning and its consistency with earlier and later pronouncements by the same agency. *See, Paden v. U. S. Dept. of Labor*, 562 F.2d 470 (7th Cir. 1977). Here, by this 1977 opinion, the Solicitor wishes to reverse what had been approximately 40 years of consistent administrative interpretation. To do so would require compelling indications that prior construction of a statute with those charged with its execution was clearly erroneous. This is especially true when Congress has refused to alter the administrative construction. *See, U. S. v. Radio Television Directors Ass'n.*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

It has been held that where administrative practice has been consistently and generally unchallenged, such interpretation and practice has particular weight when it has been followed by individuals charged with responsibility of its operation; and where such practice is disputed in later years, more weight should be given to interpretations made closer in time to the making of the law being construed. *Citizens Band of Potawatomi Indians of Okl. v. U. S.*, 391 F.2d 614 (U.S.Ct.Cl.1967), *cert. denied*, 389 U.S. 1049, 88 S.Ct. 771, 19 L.Ed.2d 839 (1968).

Applying the above principles to the facts here, the Solicitor's 1977 memorandum loses its persuasiveness because it failed to provide this court with compelling reason by either legislative history or case law authority to clearly show Congress' intent to repeal the states' historical taxing power.

Since administrative interpretation over many years is entitled to great weight, *C. I.*

*R. v. First Sec. Bank of Utah*, 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972), the Tribe is saddled with a particularly difficult burden to show that a statute's construction over many years has been clearly wrong. The Tribe has failed to do this. The court is bound by the plain meaning of the statute, past administrative interpretations and case law all upholding the validity of the statute. *See, British-American Co. v. Board of Equalization of Montana*, 299 U.S. 159, 57 S.Ct. 132, 81 L.Ed. 95 (1936). In short, the Tribe has failed to overcome the presumption of this statute's validity.

■ Next, the Tribe argues that the failure of Congress to state the relationship between the 1924 taxing authority statute and the 1938 Act creates an ambiguity which must be resolved in favor of the Tribe. While this court is in agreement with the assertion that when statutes dealing with Indians are ambiguous, resolution of any ambiguity should be in favor of the Indian position, *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the court finds no ambiguity in the statutes.

The taxing power of the state in the 1924 Act is specific and clear. The fact that a later act was passed dealing with the general leasing scheme of tribal lands does not, without more, repeal or otherwise create an ambiguity which must be resolved in favor of the Tribe's position. The failure of Congress to clearly repeal a well-known taxing power of the state is, in itself, an intention by Congress to leave the 1924 statute intact. Again this is reinforced by Congress' acquiescence, if you will, to 40 years of consistent statutory interpretation and the clause dealing with repeal of anything *inconsistent* with the new Act.

Nor does the Indian Reorganization Act, 25 U.S.C. § 476, support the contention that the 1938 Act repealed the 1924 Act. The expressed congressional intent in enacting the I.R.A. was to further the achievement of economic independence for the Indian and for the establishment of an effective system of tribal self-government. This court rejects any argument that the Act did anything to the 1924 Act.

■ Indeed, the I.R.A. supports a contrary conclusion. It is the purpose of the I.R.A. to allow Indians to enter the economic world on an equal footing; taxation statutes such as these are an economic fact of oil and gas production. Like the court in *Fort Mojave Tribe v. San Bernardino County*, 543 F.2d 1253, 1256 (9th Cir. 1976), when confronted by a similar issue, the court refuses to find that the Indian Reorganization Act supports a tax exemption for non-Indian lessees on Indian land. *See also, Mescalaro Apache Tribe v. Jones*, 411 U.S. 145, 153–54, 93 S.Ct. 1267, 1273, 36 L.Ed.2d 114 (1973).

Finally, it should be pointed out that neither the Tribe's citation to *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), or to *Central Machinery Co. v. Arizona State Tax Comm.*, 448 U.S. 160, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980), are in point here. Both cases deal with state taxes which were struck down due to comprehensive federal regulation which preempted state taxes. In neither case was there any express congressional statement authorizing state taxation. In this case, however, we have specific congressional authorization for the state to tax oil and gas production on the Reservation.

■ Thus there is little or no evidence to support the assertion that the 1938 Act precludes the state from taxing oil and gas production on leased lands owned by the Tribe. The cardinal principle against *subsilentio* repeal is a rule of interpretation based upon probable congressional intent. Where, as here, there is no congressional signal other than a subsequent passage of a comprehensive leasing law which neither authorizes nor precludes state taxation of leased lands owned by the Tribe, and coupled with the consistent judicial and administrative interpretation over the last quarter of a century, the court declines to rule that the state is stripped of its historical taxing power.

Therefore, the Montana oil and gas production taxation statutes are valid[2] as applied to the non-Indian lessees within the Blackfeet Indian Reservation. Defendants have shown there is no triable issue of fact and are entitled to summary judgment as a matter of law.

Accordingly, summary judgment is entered in favor of defendants and against plaintiffs in this action.

---

2. Since the statutes are valid here, I need not reach the question of where the legal incidence of the tax falls. I only pause to note that where, as here, there can be no direct encumbrance on the lessor's interest, and where there is only an indirect economic effect on the Indian lessors, the legal incidence of the tax would most likely fall upon the non-Indian lessee.

See, Fort Mojave Tribe v. San Bernardino County, 543 F.2d 1253, 1256 (9th Cir. 1976), and cases cited therein.